**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEANNA HALL, | ) | CASE NO.  1:19-CV-02303 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Deanna Hall ("Plaintiff" or "Hall"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for

Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II

and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. §

636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On January 14, 2016, Hall filed an application for DIB and SSI alleging a disability onset date of October 15, 2015 and claiming she was disabled due to spondylorarthropathy, pain radiating into left hip, scoliosis, and asthma.  (Transcript ("Tr.") at 312, 314.)  The applications were denied initially and upon reconsideration, and Hall requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 390.)

On June 8, 2018, an ALJ held a hearing, during which Hall, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 409-559.)  On August 1, 2018, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 13-22.)  The ALJ's decision became final on August 21, 2019, when the Appeals Council declined further review.  (*Id.* at 1-5.)

On October 3, 2019, Hall filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)  Hall asserts the following assignments of error:

(1)  WHETHER THE ALJ ERRED IN GIVING LITTLE WEIGHT TO THE OPINION OF SOCIAL SECURITY'S CONSULTATIVE EXAMINING PHYSICIAN IN REGARD TO MS. HALL'S PHYSICAL LIMITATIONS.

(2)  WHETHER THE ALJ FAILED TO ADEQUATELY ADDRESS ALL THE MENTAL LIMITATIONS IDENTIFIED BY SOCIAL SECURITY'S MENTAL HEALTH EXAMINING CONSULTANT, EVEN THOUGH SHE GAVE THE CONSULTANT SOME TO SIGNIFICANT WEIGHT.

(3)  WHETHER NEW AND MATERIAL EVIDENCE PROVIDES GOOD CAUSE FOR REMAND.

(Doc. No. 13 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Hall was born in May 1965, and was 50 years-old at the time of her alleged disability onset date, making her "a person closely approaching advanced age" under social security regulations. (Tr. 313.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a GED, completed some college course work, and is able to communicate in English.  (*Id.* at 242, 270, 468.)  She has past relevant work as a customer service representative and an office clerk.  (*Id.* at 270, 468, 511-15, 560.)

### B.  Relevant Medical Evidence[2]

#### 1.  Mental Impairments

On April 26, 2016, Cheryl Benson-Blankenship, Ph.D., performed a consultative psychological evaluation of Hall.  (*Id.* at 648-53.)  During the examination, Hall was fully cooperative, without evidence of malingering.  (*Id.* at 651.)  Her affect appeared to be mildly constricted and congruent with a depressed mood, and her speech was coherent, logical, and organized. (*Id*.)  Hall described her daily activities included using a computer for six hours a day, knitting, sewing and making simple meals.  (*Id.* at 652.)   Dr. Benson-Blankenship opined Hall appeared to have the ability to reason and understand, with generally intact memory and only mildly impaired sustained concentration and persistence.  (*Id.* at 652.) She was able to follow 3-step commands with no difficulty, but had difficulty following more complex tasks.  (*Id*.)  She had a history of interpersonal conflict at work and in her personal life.  (*Id.*)  Her social presentation was unremarkable.  (*Id.* at 653.)   Dr. Benson-Blankenship diagnosed major depressive disorder,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

recurrent, moderate, borderline intellectual functioning, and nicotine dependency and offered a guarded prognosis.  (*Id.* at 652.)  She opined that Hall could understand and apply instructions in a work setting close to her intellectual functioning in the borderline range, but "may have some issues with mildly reduced attention and concentration which may impeded [sic] focus."  (*Id.* at 653.)  She also opined that Hall's "stress tolerance may be impeded by her depression and lack of energy." (*Id.*)  She explained Hall "would be expected to be able to respond to work place pressures. She would be more effective in a work place setting where there was minimal social interaction with co-workers due to her reduced stress tolerance."  (*Id.*)

On November 3, 2016, Hall began mental health treatment at the Charak Center.  (*Id.* at 766.)  At the initial evaluation, she had normal appearance, demeanor, behavior, motor and cognition, but impaired memory, fair judgment and poor concentration.  (*Id.* at 768.)  She reported mood swings, depression, isolation, tearfulness, low motivation, sleepless nights, impulsive behavior, paranoia, worry, anxiety, shakiness, and a rapid heartbeat.  (*Id.* at 769, 774.)  She reported occasional passive suicidal ideation, but no plan or thoughts of harming herself.  (*Id.* at 769.)  Hall was diagnosed with bipolar disorder and anxiety disorder and it was recommended she participate in individual psychotherapy.  (*Id.* at 769, 778.)

On October 23, 2017, Hall returned to Charak Center for her first visit in six months due to moving.  (*Id.* at 820.)  She reported increased depression.  (*Id.*)  She had normal gait, was well-groomed, normal motor activity, had a cooperative demeanor, a full affect, normal memory, good insight and fair judgment, but had a depressed mood.  (*Id.* at 825.)  Hall was diagnosed with bipolar disorder, anxiety disorder, obsessive-compulsive disorder, and alcohol abuse.  (*Id.* at 826.)

4

On March 1, 2018, Hall returned to the Charak Center.  (*Id.* at 974.)  Susan Shefner, Psy.D., Hall's therapist at the Charak Center, noted Hall was irritable, reported a recent period where she would not shower or get dressed, and reported "significant trouble with sleep," conflict with her mother, "paranoia which is mostly concern that she will set her mom off," mania, anxiety, and no socializing.  (*Id.* at 974-75.)  Records reflect symptoms including severe depression, mood swings, irritability, racing thoughts, decreased energy, impaired concentration, decreased interests, anxiety, and panic attacks two to three times a week.  (*Id.* at  975.)  Caregivers observed Hall had a normal gait, depressed and irritable mood, full affect, cooperative demeanor, normal memory, attention, concentration, insight, and judgment.  (*Id.* at 976-77.)  Hall's diagnoses were bipolar disorder, anxiety disorder, obsessive-compulsive disorder, and alcohol abuse, with no use since Christmas. (*Id*.)  She was described as making some progress in therapy. (*Id.* at 981.)

On April 23, 2018, Hall returned to the Charak Center for therapy with Dr. Shefner, and was assessed as much improved since beginning treatment.  (*Id.* at 1088.)

On June 12, 2018, Hall returned to the Charak Center for therapy with Dr. Shefner, and reported moderate depression, mood swings, irritability, loneliness and anxiety.  (*Id.* at 1090.)  Her medications were adjusted.  (*Id.*)  Caregivers observed she had euthymic mood, full affect, cooperative demeanor, normal attention/concentration, and was of average intelligence. (*Id.* at 1091-92.)

On October 22, 2018, Dr. Shefner completed a medical source statement regarding Hall's mental capacity.  (*Id.* at 169.)  Dr. Shafner reported Hall had been in treatment since November 3, 2016 for bipolar disorder, obsessive-compulsive disorder, and unspecified anxiety disorder with symptoms of low mood, tearfulness, mood swings, impulsivity, verbal angry outbursts, problems

5

maintaining focus, and anxiety with racing thoughts, chest pain, and smoking.  (*Id.* at 171.)  She opined Hall had marked impairment in the areas of cooperating with others, handling conflict, asking for help, responding to requests, suggestions, and criticism, sustaining an ordinary routine and regular attendance, working a full day without needing extra rest periods, adapting to change, and managing her psychologically-based symptoms.  (*Id.* at 170-71.)

### 2.      Physical Impairments

On November 17, 2011**,** Dr. Isam Diab, a rheumatologist, examined Hall. (*Id.* at 580.) Physical examination revealed modest synovitis at the first, second and third proximal interphalangeal joints with some synovial thickening, mild decrease in flexion at the proximal interphalangeal joints, mild synovitis and synovial thickening at the second metacarpophalangeal joint of the right hand and the third metacarpophalangeal joint of the left hand, mild tenderness over the mid lower spine and para lumbar area, tense muscles around the lumbar spine, positive straight leg raising on the right, and depressed deep tendon reflexes at the knees and achilles tendons.  (*Id.*)

On February 8, 2012, Hall returned to Dr. Diab for a follow-up appointment.  (*Id.* at 579.) Dr. Diab noted tender points over Hall's sub occipital area, mid upper trapezius, medial lower paracervical area, buttock area, lateral epicondyle, second sternocoastal margin, lateral trochanteric area, and medial knee bilaterally, all consistent with active fibromyalgia.  (*Id.*)  He opined that the clinical and objective findings were consistent with fibromyalgia and possibly another connective tissue disease, myofasical pain syndrome of the upper and lower back, and lumbar spondylosis with left radiculopathy.  (*Id.* at 568-79.)

On March 3, 2014, Hall returned to Dr. Diab for treatment.  (*Id*. at 567.)  She reported she had not been doing better with Raynaud's symptoms of coldness in her fingers and toes,

discoloration of her toes, and a burning feeling, low back pain radiating to the right hemiplevis and increased with bending, lifting, and prolonged sitting, generalized fatigue, and occasional morning stiffness.  (*Id*.)  On physical examination, Dr. Diab noted minimal tender points, on the right side more than the left; mild tenderness over the mid lower spine and para lumbar area; tense muscles around the lumbar spine; straight leg raising on the right depressed deep tendon reflexes at the knees and achilles tendons; modest crepitus in both knees; and multiple hammertoes, the right foot more than the left.  (*Id*.)  Dr. Diab's diagnoses included Raynaud's phenomenon, "very likely" fibromyalgia, a partial rotator cuff tear with possible fracture, residual subacromial bursitis of the left shoulder, scoliosis with thoracolumbar spondylosis with left radiculopathy, myofascial pain in the right hemipelvis, patellofemoral syndrome, a history of hypertension, vitamin D deficiency, restless leg syndrome, and multiple hammertoes.  (*Id*.)   Dr. Diab opined that he believed, with reasonable medical certainty, Hall was disabled because of active fibromyalgia and chronic lower back pain with para lumbar pain, because of levocurvature of the thoracolumbar spine.  (*Id*.)

On January 13, 2015, a bone mineral densitometry study demonstrated minimal osteopenia of L1, L2, and L4, moderate osteopenia of L3, minimal osteopenia of the left hip, and moderate osteopenia of the right femoral neck.  (*Id*. at 598-99.)

On January 13, 2015, spirometry performed several hours after Hall used albuterol showed a "mild obstructive lung disease without reversibility."  (*Id*. at 621.)

On February 26, 2015, Dr. William Crowe noted Hall had a better mood and reported improvement in her fibromyalgia and other conditions, but had pain in her right hip.  (*Id*. at 605.)

On June 6, 2015, a lumbar x-ray showed mild facet arthropathy of Hall's lower lumbar spine. (*Id*. at 589.)   Imaging of Hall's hips and sacroiliac joints was unremarkable. (*Id*. at 587, 588.)

On September 4, 2015, a cervical x-ray revealed osteopenia and degenerative disc disease at C4-5 and C5-6.  (*Id*. at 584.)

On December 8, 2015 Dr. Crowe noted Hall complained of pain, including in her neck and hips, after being off Naproxen. (*Id*. at 602.)

On February 29, 2016, Dr. Bassam Alhaddad treated Hall for low back pain, right sided lateral hip pain, intermittent pain in the achilles tendon area, and morning stiffness.  (*Id*. at 655.) It was her first visit in two years.  (*Id*.)  Hall reported doing well with her prescriptions for Norco, Naproxen, and Cymbalta.  Physical examination revealed osteoarthritic changes of the distal interphalangeal joints, bilateral trochanteric bursa tenderness, limited internal rotation of the right hip, tenderness of the sacroiliac joints bilaterally, and bilateral knee crepitus. (*Id*.)  Dr. Alhaddad's impression was spondyloarthropathy by history, chronic obstructive pulmonary disease, long term use of opiates for pain, lumbar spondylosis,secondary fibromyalgia, and generalized osteoarthritis**.** (*Id*.)  He expressed concern about her prescribed long-term opiate use, but still refilled her Norco prescription, and recommended pain management and physical therapy.  (*Id*.)

On March 18, 2016, Dr. Paul Shin at Cleveland Clinic's pain management clinic recommended Hall stop using opiate medication and diagnosed chronic pain syndrome and fibromyalgia.  (*Id*. at 703-04.)  She described her pain as a five on a scale of one to ten.  (*Id*. at 704.) Examination revealed normal gait, intact range of motion and sensation, negative straight-leg raising test and full strength in all extremities.  (*Id*. at 706.)

On April 9, 2016, Dr. Sanjeet Rangarajan performed a consultative evaluation of Hall at Social Security's request.  (*Id*. at 638.)  Dr. Rangarajan noted no lung abnormalities.  (*Id*. at 639.) On examination, Hall had intact range of motion of the extremities and spine, full strength, normal

gait, reflexes, and no significant deformities or joint abnormalities.  (*Id*. at 640.)  She did not have any tenderness in her extremities, but did have pain with manipulation of her joints and muscles, reduced range of motion in back extension, and tenderness to palpation along the thoracic and lumbar spine.  (*Id*. at 640-41.)  Dr. Rangarajan stated Hall "had a normal gait and was able to perform regular, as well as heel to toe walking, without any significant difficulty." (*Id*. at 640.)  Hall did not exhibit any abnormal behaviors and demonstrated good judgment and reasoning.  (*Id*.)  Dr. Rangarajan's impression was diffuse chronic pain syndrome secondary to arthritis, fibromyalgia, and spondyloarthropathy, and/or other rheumatologic disorders.  (*Id*.)  He opined that, until she received a final rheumatological diagnosis and appropriate treatment, Hall "would be somewhat limited in terms of her ability to work secondary to her pain. I would recommend that she lift no more than 10 pounds and walk for no longer than 5 minutes at a time.  Likewise, standing for longer than 5 minutes would likely be a significant burden for her." (*Id*. at 641.)

On June 9, 2016, Dr. Anthony Cirino treated Hall for a refractive error, conjuctiva, allergic conjuctivitis, glaucoma, and dry eye syndrome.  (*Id*. at 913.)

On June 27, 2016, Hall returned to see Dr. Alhaddad for treatment of continued pain in her low back, both lower extremities, and left groin, and for morning stiffness.  (*Id*. at 654.)  She reported doing well on Norco and other medication, although she still experienced pain with activity. (*Id*.)

On September 19, 2016, Dr. Alhaddad saw Hall again, and noted her back and hip pain continued, and she was also experiencing pain in the both carpometacarpal joints.  (*Id*. at 661.)  Dr. Alhaddad planned to decrease Hall's Norco.  (*Id*.)

9

On September 21, 2019, pelvis and hip x-rays were obtained, and were unremarkable.  (*Id*. at 667-68.)

On September 28, 2016, Hall tripped and fell, fracturing her right distal radius.  (*Id*. at 678-79, 690.)  She immediately presented to an urgent care, and later an emergency room, where on examination there was an obvious deformity of the distal forearm, tenderness with swelling of the distal radius and ulna, minimal wrist range of motion, decreased grip strength, and slight decreased sensation involving the tips of the index, middle, and ring fingers.  (*Id*. at 679, 700-01.)  Hall was placed in a splint and referred to an orthopedic surgeon.  (*Id*. at 679, 698, 701.)

On October 13, 2016, Hall underwent an open reduction internal fixation of her wrist and a right carpal tunnel decompression at Cleveland Clinic's Medina Hospital.  (*Id*. at 727.)

On November 4, 2016, Hall saw Dr. Katherine Ayers for primary care.  (*Id*. at 782-87.)  Dr. Ayers noted Hall had been experiencing palpitations, likely due to stress. (*Id*. at 786.)

The right wrist open reduction and internal fixation failed.  (*Id*. at 801.)  On March 17, 2017, the hardware was removed, and Hall underwent a wrist arthrodesis.  (*Id*.)

On April 3, 2017, Hall's wrist pain had improved and an orthopedist, Dr. Bradley Pierce reported that she had mild, appropriate swelling on the ulnar side.  (*Id*. at 945.)  She had removed her splint, and Dr. Pierce intended to place her wrist in a cast for "another month or so."  (*Id*.)

On May 3, 2017, Hall returned to Dr. Pierce without the cast, which she reportedly took off on her own a few days prior.  (*Id*. at 951.)  Dr. Pierce ordered a functional brace and prescribed occupational therapy.  (*Id*.)

On September 18, 2017, Hall saw Dr. Stephen Lacey for treatment of pain and numbness in her wrist fusion.  (*Id*. at 807.)  Dr. Lacey noted Hall's right wrist demonstrated a popping sensation

when she tried to rotate her forearm and that her ulna was a bit longer than it should be.  (*Id*. at 810.)
He opined the ulna could be impacting against the ulnar carpus or there could be a partial nonunion
of the fusion.  (*Id*.)  He recommended Hall wait three more months to see if her symptoms resolved
and not undergo any surgical revision for at least one year following her wrist fusion.  (*Id*.)

On October 24, 2017, Dr. Pierce examined Hall again and noted she reported continuing
wrist pain and had developed pain in her fingers.  (*Id*. at 958.)  Her fingers felt warm to the touch
and she had difficulty bending them and opening jars.  (*Id*. at 958-59.)  Dr. Pierce ordered
occupational therapy.  (*Id*. at 959.)

On November 20, 2017, Hall returned to Dr. Cirino to follow up on her preglacoma, bilateral
dry eye syndrome, bilateral conjuctival edema, bilateral eyelid dermatochalasis, and other chronic
allergic conjunctivitis.  (*Id*. at 917.)

On December 14, 2017, Dr. Babu Eapen conducted a sleep study of Hall. He noted Hall's
diagnoses included snoring, periodic limb movement disorder, mild intermittent asthma, cigarette
nicotine dependence, and anxiety.  (*Id*. at 966.)

A polysomnogram obtained on November 10, 2017, demonstrated prolonged sleep onset,
decreased sleep efficiency, and significant periodic leg movements with arousals, but no significant
sleep apnea.  (*Id*. at 969.)

On March 6, 2018, Hall saw Dr. Pierce for treatment of acute pain in her right shoulder, pain
in her right wrist, and chronic narcotic use.  (*Id*. at 1047.)  Her right wrist was x-rayed and showed
probable ankylosis of the proximal carpal row and radius.  (*Id*. at 1045.)

On March 22, 2018, Hall started occupational therapy to treat her chronic right hand and
wrist pain and weakness.  (*Id*. at 996.)  The therapist noted Hall was limited in gripping, pinching,

11

twisting, and pulling. She was instructed in activity modification and provided with a compression sleeve to wear on her right arm.  (*Id*. at 998.)

At her second occupational therapy session, Hall was prescribed a prefabricated thumb spica splint and instructed in the use of a TENS unit.  (*Id*. at 1006.)

On April 13, 2018, Hall saw Dr. Robert Castele for her asthma/chronic obstructive pulmonary disease.  (*Id*. at 1026.)  Dr. Castele observed wheezing and recommended pulmonary function studies.  (*Id*. at 1026-27.)  A chest x-ray taken the same day showed normal findings.  (*Id*. at 1039.)

On May 14, 2018, rheumatologist Dr. Marie Kuchynski evaluated Hall. (*Id*. at 1060.)  Hall reported she was told she had spondyloarthritis, but Dr. Kuchynski opined, "[r]eports patient brought for me to review do not show any signs of spondyloarthritis."  (*Id*.)  Hall requested Norco, which she said was the only medication that helped her pain.  (*Id*.)  Dr. Kuchynski noted Hall's memory, mood, and affect were normal.  (*Id*. at 1064.)  She diagnosed fibromyalgia, arthritis, Raynaud's phenomenon, a history of spondyloarthropathy, restless leg syndrome, primary osteoarthritis of the knees bilaterally, and chronic back pain. (*Id*.)  Lab tests and x-rays were normal, except for arthritis in Hall's neck.  (*Id*. at 1075.)  Dr. Kuchynski recommended anti-inflammatory medication and physical therapy for pain relief.  (*Id*.)

C.      **State Agency Reports**

1.      **Mental Impairments**

On May 5, 2016, Social Security Reviewing Psychologist Kristen Haskins, Psy.D., reviewed Hall's record and limited her to simple, multi-step, non-complex tasks, with some limitations during lapses in concentration.  (*Id*. at 290.)  She also opined Hall would need a static setting without

demands for a fast pace or more than occasional changes, where she can work away from others, with no more than superficial and occasional social interaction, and with no timed tasks or rate quotas.  (*Id*. at 290-291.)

On November 15, 2016, Social Security Reviewing Psychologist Karen Terry, Ph.D. agreed with Dr. Haskins' mental residual functional capacity assessment.  (*Id*. at 348-349.)

### 2.    Physical Impairments

On April 28, 2016, Social Security Reviewing Physician Dr. Indira Jasti reviewed Hall's records and opined Hall could lift and carry up to 20 pounds and could stand/walk and sit about six hours in an eight-hour work day.  (*Id*. at 287.)

On November 17, 2016, Social Security Reviewing Physician Dr. Amiri, concurred with Dr. Jasti's opinion.  (*Id*. at 347.)

### D.    Hearing Testimony

During the June 8, 2018 hearing, Hall testified to the following:

• She was born in May 1965.  (*Id*. at 241.)

• She currently lives with her mother in Brunswick, Ohio.  (*Id*.)

• She receives food stamps and Medicaid.

• She has a driver's licence, and last drove about two months prior to the hearing. She doesn't drive because her hand gets numb, and she gets neuropathy in her feet. (*Id*. at 241-42.)

• She completed some college, and was working towards a Medical Assistant certification, but did not complete the program.  (*Id*. at 242.)

• The last time she worked for pay was August of 2006, doing label alphabetizing at home at her own pace.   She worked about 20 hours a week, for about 4 months. She quit when she was told she could no longer work from home.  (*Id*.)

13

- She felt she could not perform the work at the company worksite, because she would not be able to work at her own pace, taking breaks when she needed to. Although her work totaled 40 hours a week at home, she was taking "lots of breaks" to pace herself.  (*Id*. at 243.)

- Prior to that job, she worked as a temporary secretary through an agency for a year and a half.  Some of the jobs were full-time, others were part-time.  (*Id*. at 244-45.)

- Prior to the secretarial work, she was a full-time customer service representative for Sears.  She communicated with customers via phone and computer.  While performing that job she sometimes had to go on medical leave because of her back pain and fibromyalgia.  (*Id*. at 245-46.)

- She was fired from Sears due to insubordination.  This was the result of an argument about whether she was allowed to use an elevator as a medical accommodation. (*Id*. at 246-47.)

- Prior to working for Sears, she did temporary secretarial or customer service work through an agency.  (*Id*. at 247.)

- One regular temporary placement was the Regional Income Tax Agency.  She worked for them annually from January through the summer doing data entry. (*Id*. at 248.)

- She cannot work because she has cervical arthritis in her back, severe arthritis in her knees and her right wrist has been fused.  (*Id*. at 252.)

- Her lower and middle back is "[v]ery painful on a daily basis."  She can no longer clean her mother's house.  She also has neck pain, making it "very hard" to look down. (*Id*. at 253.)

- She broke her right wrist in September 2016.  Initially, the surgeon performed an internal fixation, but that broke off, and she required a second surgery in May 2017 to fuse the wrist bones.  She continues to have pain from "post-op arthritis" in her right hand and wrist.  (*Id*. at 254-55.)

- She can't bend her wrist up and down, or open cans.  Repetitive work like using a mouse causes pain.  (*Id*. at 256.)

- She had 2 sessions of occupational therapy, which did not help.  She was given a brace, which she does not use because it prevented her from moving her hand.  (*Id*. at 257.)

14

- She has panic attacks a "couple times a week" because of her anxiety.  When she has a panic attack, her heart starts racing, and she tries to calm herself with deep breathing, but that doesn't always work.  (*Id*. at 258-59.)

- She takes Buspar for anxiety and panic attacks, but so far it hasn't been helpful. (*Id*. at 259.)

- She also has bipolar disorder.  During her last manic episode, a couple of moths ago, she slept "maybe four hours a night," and woke up with "all kinds of energy." When she is depressed, she wants to sleep "all the time," and sleeps 12 to 14 hours a day.  (*Id*. at 259-60.)

- The arthritis in her knees causes pain, and she "can't bend down without needing aid to get up."  (*Id*. at 260-61.)

- She is not experiencing side effects from her current medications.  A prior medication, Vraylar, caused her to grind her teeth.  (*Id*. at 261.)

- She uses a TENS unit every couple of days, when she's "in bad pain."  She is also supposed to get physical therapy for her neck, but hasn't made an appointment yet. (*Id*. at 262.)

- She sees a counselor and a caseworker for her mental healthcare, either every two weeks or once a month.  She finds counseling somewhat helpful.  (*Id*. at 263.)

- She smokes about eight cigarettes a day.  (*Id*.)

- She rarely drinks alcohol and never uses illegal or recreational drugs.  She once overdosed on prescription medication.  (*Id*.)

- Her hobbies used to be knitting, bowling, and shooting pool, but she is now unable to do any of those things.  (*Id*. at 264.)

- She used to spend up to 6 hours a day on the computer.  Now, after 2 hours, her hand starts aching.  She plays Yahtzee on the computer.  (*Id*.)

- She needs assistance with personal hygiene tasks like shaving and sometimes getting up from the toilet.  (*Id*.)

- She is ambidextrous, and now eats and writes with her left hand.  (*Id*. at 265.)

- She and her mom grocery shop together.  Her mom drives.  She can load items into the cart and carry bags with her left hand only.  (*Id*.)

15

- Carrying more than 3 to 5 pounds in her right hand is painful.  (*Id*. at 266.)

- She can wash clothes and prepare "fast meals," like one-pot stews.  (*Id*.)

- She never goes out socially.  (*Id*.)

- Raynaud's Syndrome causes her feet to get discolored and blister when they get cold. Because her feet frequently become numb, she is afraid to drive. (*Id*. at 267-68.)

- She has short-term memory problems, and has noticed her concentration is worse, which she attributes to either her medications or stress.  (*Id*. at 268.)

- She can walk or stand for 10 minutes at a time, and sit for 15 or 20 minutes before she has to move around.  (*Id*. at 268-69.)

The VE testified Hall had past work as a Customer Service Representative and as an Office Clerk.  (*Id*. at 270.)  The ALJ then posed the following hypothetical question:

> [A]ssume an individual of the Claimant's age, education, and with the past jobs that you have described.  I'd like you further to assume that the individual can perform light work, as defined in the regulations, with the following additional limitations, She can never climb ladders, ropes, or scaffolds; and can occasionally climb ramps or stairs.  She can frequently kneel or crouch; and can occasionally crawl.  She must avoid concentrated exposure to poor ventilation and pulmonary irritants, such as fumes, odors, dust, and gases.  She must avoid all exposure to workplace hazards, such as unprotected heights and moving mechanical parts.  The individual can understand, remember, and carry out instructions to perform detailed, but not complex, tasks, meaning she can perform semi-skilled work, but not at a production-rate pace, such as assembly line work, and not with strict production quotas.  She can interact occasionally and superficially with supervisors, coworkers, and the public; with superficial defined to mean no sales, arbitration, negotiation, confrontation, conflict resolution, or responsibility for the safety and welfare of others.  She can adapt to occasional changes in the work setting, so long as those changes are explained in advance and implemented gradually. Could that hypothetical individual perform any of the past jobs that you've described?

(*Id*. at 270-71.)

The VE testified the hypothetical individual would not be able to perform Hall's past work as a Customer Service Representative, because of the limitations on interaction with others, but

16

could perform her past work as an Office Clerk.  (*Id*. at 271.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as Clerical Assistant, Housekeeping Cleaner, and Mail Clerk.  (*Id*.)

The ALJ posed a second hypothetical:

> [T]ake that same individual but add an additional limitation that the individual can occasionally reach overhead with her bilateral upper extremities, would that change your responses with respect to past work or other jobs that are available?

(*Id*. at 272.)

The VE testified that the hypothetical individual would still be able to perform the jobs he had cited.  (*Id*.)

The ALJ posed a third hypothetical:

> [T]ake the individual in the most recent hypothetical . . . and add an additional limitation that the individual can frequently reach, handle, and finger with her right upper extremity.  Could that hypothetical individual perform any of Claimant's past work?

(*Id*. at 272-73.)

The VE testified that the hypothetical individual would still be able to perform the jobs he had cited.  (*Id*.)

Next, the ALJ added an additional limitation that the individual could occasionally handle with her right upper extremity.  (*Id*. at 273.)  The VE testified that this would exclude the Office Clerk job, and the other jobs he identified, with the exception of Housekeeping Cleaner.  (*Id*. at 273-74.)  The VE stated the hypothetical individual would be able to perform other representative jobs in the economy, such as Usher.  (*Id*. at 274.)

The ALJ asked what effect limiting lifting and carrying with the right extremity to 10 pounds would have on the availability of the Office Clerk job.  (*Id*. at 274-75.)  The VE explained that job

17

would no longer be available, but jobs such as Usher, Office Helper or Clerical Assistant would be available.  (*Id*. at 275.)

The ALJ asked what effect limiting the individual to four hours of standing or walking would have on the available jobs.  (*Id*.)  The VE explained this would reduce the hypothetical individual's residual functional capacity ("RFC") to "sedentary," and exclude all of the "light work" jobs he had identified.  (*Id*.)  Also, the VE explained changing the hypothetical limitation from "semi-skilled" jobs to "simple, routine tasks" would have precluded all of Hall's past work.   (*Id*. at 277.)

Finally, the VE testified that, based on his experience, off-task time of more than 15% daily or absences of more that two a month on a regular basis would preclude competitive employment.  (*Id*. at 276.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

18

First, the claimant must demonstrate she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Hall was insured on her alleged disability onset date, October 15, 2015, and remained insured through December 31, 2020, her date last insured ("DLI.") (Tr. 11, 13.) Therefore, in order to be entitled to DIB, Hall must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

19

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.      The claimant has not engaged in substantial gainful activity since October 15, 2015, the alleged onset date.

3.      The claimant has the following severe impairments: degenerative disc disease of the cervical spine with facet arthropathy and foraminal narrowing; degenerative disc disease of the lumbar spine with facet arthropathy; osteoarthritis of the cervical and lumbar spine, DIP joints and right wrist; fracture- status post open reduction internal fixation (ORIF) and arthrodesis of the right wrist/carpal tunnel syndrome; fibromyalgia; asthma; affective disorder (major depressive disorder/bipolar disorder); anxiety disorder; obsessive compulsive disorder (OCD); and alcohol abuse disorder.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps or stairs; she can frequently kneel or crouch, and occasionally crawl; she must avoid concentrated exposure to poor ventilation and pulmonary irritants such as fumes, odors, dusts, and gases; she must avoid all exposure to workplace hazards such as unprotected heights and moving mechanical parts; she can understand, remember, and carry out instructions to perform detailed, but not complex tasks, meaning that she can performed (sic) semi-skilled work, but not at a production rate pace, such as assembly line work, and not with strict production quotas; she can interact occasionally and superficially with supervisors, coworkers, and the public, with superficial defined to mean no sales, arbitration, negotiation, confrontation, conflict resolution, or responsibility for the safety or welfare of others; she can adapt to occasional changes in the work setting, so long as those changes are explained in advance and are implemented gradually. Additionally, beginning on September 28, 2016, due to claimant's right wrist impairments, the

20

claimant has the additional limitation: she can frequently reach, handle, and finger with her right upper extremity.

6.    The claimant is capable of performing past relevant work as an office clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.    The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2015, through the date of this decision.

(Tr. 13-22) (citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388,

21

389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

22

## VI.  ANALYSIS

### A.        The Consultative Examiners' Opinions

Hall asserts the ALJ erred in her handling of both of the consulative examiner's opinions in the case.  First, she argues the ALJ erred by giving "little weight" to the opinion of Social Security's consultative examining physician, Dr. Sanjeet Rangarajan.  (Doc. No. 13 at 14.)  Next, Hall asserts the ALJ erred by failing to address psychological examiner Dr. Benson-Blankenship's findings that Hall "has borderline intellectual functioning and is limited to tasks within this intellectual level, is restricted to simple and some multi-step tasks, has difficulty performing more complex tasks, and needs minimal interaction with coworkers."  (Doc. No. 13 at 19.)  In both cases, Hall argues that incorporating the consultative examiners' opinions more fully into the RFC would have led the ALJ to a finding of disability.  (*Id*.)

The Commissioner argues the ALJ based both of these decisions on significant evidence, and clearly explained her reasoning in her Decision.  (Doc. No. 15 at 9-10, 17.)

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. §416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved for the Commissioner.  *See* 20 C.F.R. §416.927(d)(2).  An ALJ "will not give any special significance to the source of the opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. §416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. §416.946(c).  "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence."  *Carter v. Comm'r of Soc. Sec.,* No. 1:10  cv  804, 2012 WL 1028105 at *7 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.,* 680 F.2d 472 (6th

23

Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.,* 260 F. App'x 801, 807 (6th Cir. 2008)).

ALJs "are not required to adopt any prior administrative medical findings" in formulating the RFC.  20 C.F.R. §416.913(a).  Nonetheless, they must consider all of the medical opinions contained in the record "together with the rest of the relevant evidence." 20 C.F.R. §416.927(b), (c). The ALJ is charged with considering "all of the following factors in deciding the weight we give to any medical opinion." 20 C.F.R. §416.927(c).  These factors include: 1) examining relationship, 2) treatment relationship, 3) supportability, 4) consistency with the record, 5) specialization of the source, 6) other factors, such as understanding the disability programs and knowledge of the other information in the case record.  *See* 20 C.F.R. §416.927(c)(1)-(6).

However, the ALJ is not required to articulate specific findings as to each of these factors. Indeed, neither the regulations or Sixth Circuit case law requires an "exhaustive factor-by factor analysis." *Francis v. Comm'r Soc. Sec.,* 414 F. App'x 802, 804 (6th Cir. 2011).  If an RFC assessment *conflicts* with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. *Puckett v. Colvin,* No. 3:13  CV  01486. 2014 WL 1584166, at *8 (N.D. Ohio Apr. 21, 2014) (*citing* Social Security Ruling 96-8p, 1996 WL 374184, *7 (July 2, 1996)).  However, if the medical source is a consultative examiner, the ALJ is not required to give the same level of deference as accorded a treating source.  *Id*. at *9.  For a consultative examiner, the ALJ is "only required to acknowledge that their opinions contradicted his RFC finding, and explain why he did not include their limitations in his determination" of the RFC.  *Id*.

24

1.      **Dr. Rangarajan**

Hall asserts the ALJ erred by giving "little weight" to the opinion of Social Security's consultative examining physician, Dr. Sanjeet Rangarajan.  (Doc. No. 13 at 14.)  She alleges the ALJ misstated the opinion, confusing " deference to an ongoing treatment process" with uncertainty, and failed to address the findings in full. (*Id*.)  She argues that giving greater weight to Dr. Rangarajan's opinion would have limited her to sedentary work, and resulted in a finding of disability pursuant to the medical vocational guidelines.  (*Id*.)

The Commissioner responds the ALJ offered "significant reasons" for assigning Dr. Rangarajan's opinion "little weight," including that it did not specify Hall's diagnosis, was inconsistent with record evidence including Dr. Rangarajan's own examination, and "largely restated" Hall's subjective allegations.  (Doc. No. 15 at 9-10.)

In her Hearing Decision, the ALJ explained her weighing of Dr. Rangarajan's opinion as follows:

> [L]ittle weight is given to the consultative examination of Dr. Rangarajan.  Dr. Rangarajan determined that the claimant is able to lift no more than 10 pounds, walk for no more longer than 5 minutes at a time, and standing for longer than five minutes would be a significant burden for her.  This is not a specific function by function analysis, nor is it stated in vocational terms, and Dr. Rangarajan was uncertain of which conditions claimant actually had (such as within the realm of possibility that she has fibromyalgia).    Furthermore,  these  findings  are inconsistent  with  the  medical  record  as  a  whole,  including  the  claimant's generally benign test results and physical examination findings, such as those noted by Dr, Rangarajan, with tenderness to palpation along her thoracic and lumbar spine, but her range of motion was intact in the extremities, strength was 5 out of 5 in all extremities, she displayed a normal gait and reflexes, there was a reduced range of motion in the back on extension, and there were no significant deformities or joint abnormalities.  In addition, Dr. Rangarajan largely restated the claimant's subjective allegations, which are not fully consistent with the medical record for the reasons listed above.

(Tr. 20) (citations omitted).

Hall asserts "[t]he ALJ does not appear to give Dr. Rangarajan's opinion any significant value for actually examining [Hall]." (Doc. No. 13 at 15.)  This is odd, given that the ALJ specifically identifies findings from Dr. Rangarajan's examination that were inconsistent with the limitations contained in his opinion.  (Tr. 20.)  For example, his examination revealed the range of motion in Hall's spine and extremities was "intact," with "normal muscular development" and strength assessed as "5/5." (*Id*. at 640.)  He observed Hall had "normal range of motion and normal sensation without tenderness, swelling, discoloration, crepitus, weakness or deformity" in her ankles, knees, legs and hips, as well as a "normal gait," and noted Hall "was able to perform regular, as well as heel to toe walking without any significant difficulty." (*Id*.)  The ALJ's Decision makes clear she considered these examination findings, and they were a significant factor in her weighing of Dr Rangarajan's opinion.

Hall next alleges the ALJ "misstates the Doctor's conclusion regarding Hall's impairments when she finds that Dr. Rangarajan was uncertain as to which conditions the Plaintiff actually had." (Doc. No. 13 at 15.)  The Commissioner responds it was reasonable for the ALJ to consider this "uncertainty" in weighing his opinion, given that some of the diagnosis he considered probable were unltimately unsupported.  (Doc. No. 15 at 9-10.)  Dr. Rangarajan acknowledged the medical record was incomplete at the time of his evaluation, and speculated Hall "appears to have a history of rheumatologic spondyloarthropathy."  (Tr. 641.)   He opined that Hall "likely does have a rheumatologic origin of her overall pain process . . . rheumatology is still picking through her case to determine a final rheumatologic diagnosis." (*Id.*)   As the Commissioner points out, Dr. Rangarajan's opinion acknowledged this diagnosis had not yet been confirmed, and subsequent

records from rheumatologist Dr. Marie Kuchynski did not support this diagnosis.  Ultimately, the rheumatologist concluded Hall's medical records "do not show any signs of spondyloarthritis," and she found "no signs of spondyloarthritis on previous xrays. . . [which] show minimal arthritis" (Tr. 1060, 1065.)  Based on this medical evidence, the ALJ ultimately did not find a medically determinable "rheumatologic spondyloarthropathy."  (*Id*. at 13-14, 641.)

While Hall identifies other medical record evidence she believes supports Dr. Rangarajan's opinion, the opinion itself does not do so.  This is important because, under Social Security regulations, "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."  20 C.F.R. § 404.1527(c)(3).  Dr. Rangarajan lacked the benefit of the rheumatologist's records, and therefore his opinion was partially based an inaccurate guess about the cause of Hall's pain.  The ALJ appropriately considered both Dr. Rangarajan's uncertainty and the subsequent contradictory evidence in weighing the opinion.

Dr. Rangarajan's express uncertainty about the medical cause of Hall's symptoms, combined with the contradictory medical evidence in the record - including in Dr. Rangarajan's own examination - provides sufficient evidence for the ALJ's assignment of "little weight" to the opinion. While other evidence supporting the assessment exists in the medical record, it is not this Court's role to re-weigh the evidence.  Accordingly, for the reasons set forth above, the Court finds the ALJ did not err in his evaluation of the medical opinion evidence and, further, that substantial evidence supports the physical limitations set forth in the RFC.

2.       **Dr. Benson-Blankenship**

Hall asserts that, although the ALJ accorded consultative examining psychologist Dr. Benson-Blankeship's opinion "some to significant weight," she erred by failing to address Dr. Benson-Blankenship's findings that Hall "has borderline intellectual functioning and is limited to tasks within this intellectual level, is restricted to simple and some multi-step tasks, has difficulty performing more complex tasks, and needs minimal interaction with coworkers." (Doc. No. 13 at 19.)

The Commissioner responds the ALJ's assignment of "some to significant" weight to the opinion did not mean the RFC finding needed to adopt or otherwise address every aspect of it. (Doc. No. 15 at 17.) He asserts the ALJ provided a sufficient evidentiary basis for rejecting Dr. Benson-Blankenship's diagnosis of borderline intellectual functioning. (*Id*.) Further, he alleges Hall misstated Dr. Benson-Blankenship's opinion regarding Hall's ability to perform detailed tasks, and her need to be in a work place setting where there was minimal social interaction with co-workers. (*Id*. at 18.)

In her Hearing Decision, the ALJ addressed Dr. Benson-Blankenship's Opinion as follows:

> Some significant weight is given to Dr. Benson-Blankenship. Dr. Benson-Blankenship determined that claimant is able to understand and apply instructions consistent with borderline intellectual functioning, she has mildly reduced attention and concentration skills that may impede her ability to focus, her stress tolerance may be impacted by her depression and other symptoms, and she would be more effective in an environment with minimal social interaction. These opinions, while somewhat vague and not stated in vocational terms, are generally consistent with . . . the DDS psychological assessments, and the medical record as a whole. Moreover, Dr. Benson-Blankenship is a mental health specialist who had the advantage of personally evaluating the claimant before completing her assessment.

(Tr. 19.)

As the Commissioner noted, assigning "some to significant weight" to a medical opinion does not bind an ALJ to adopt every limitation therein.  The Sixth Circuit makes clear that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Matejka v. Comm'r of Soc. Sec. Admin.*, No. 1:13-cv-1933, 2014 WL 3197437, at *13 (N.D. Ohio Jul. 8, 2014) ("Even when an ALJ accords 'significant weight' to a medical opinion, the ALJ is not required to adopt every opinion expressed by the medical expert.").  As the ALJ noted elsewhere in her Decision, the assessment of borderline intellectual functioning had no evidentiary support elsewhere in the record.  She explained "[a]lthough Dr. Benson-Blankenship diagnosed the claimant with [borderline intellectual functioning] during her 2016 psychological consultative examination, there are no IQ scores in the record to verify her level of intelligence, and this diagnosis was based largely on subjective, self-reported symptoms." (Tr. 20.)  Further, the ALJ noted this diagnosis was inconsistent with other evidence in the record, including Hall's self-report she was not in special education classes and did not have an individualized education plan in school, and Hall's ability to earn her GED and participate in college classes.  (*Id*.)  Hall does not identify any evidence supporting this diagnosis.  The ALJ's Decision addresses this element of Dr. Benson-Blankeship's opinion, and makes clear she chose to exclude it based on sufficient evidence in the record as a whole.

The ALJ also addressed the portion of Dr. Benson-Blankenship's opinion that related to Hall's ability to perform complex tasks.  While Hall asserts Dr. Benson-Blankenship opined that she was limited to "simple and some multi-step tasks, [and] has difficulty performing more complex tasks," the actual language of her opinion is less precise.  (Doc. No. 13 at 19.)  Dr.

Benson-Blankenship opined that Hall was "able to persist in some tasks but had difficulty following more complex tasks."  (Tr. 652.)  Dr. Benson-Blanenship also noted Hall had a "significant work history which is uneventful through the continuous work," and that when she asked her to follow a 3-step command during the evaluations "she was able to do so with no problem."  (*Id*. at 651-52.) The ALJ addressed this limitation in the RFC by finding Hall could perform "detailed, but not complex tasks." (*Id*. at 16.)

Finally, contrary to Hall's assertions, the ALJ addressed Dr. Benson-Blankenship's opinion that Hall "would be more effective in a work place setting where there was minimal social interaction with co-workers due to her reduced stress tolerance" both in her Decision and in her finding of RFC.  (*Id*. at 653; Doc. No. 13 at 19.)  This is the section of Dr. Benson-Blankenship's opinion that is "somewhat vague," as she also opined Hall, "would be expected to be able to respond to work place pressures," making it unclear whether Dr. Benson-Blankenship considers minimal social interaction necessary or merely believes it is the optimal work condition for Hall.  The RFC limited Hall to interacting "occasionally and superficially" with supervisors, co-workers, and the public.  (Tr. 16.)  This limitation is consistent with Dr. Benson-Blankenship's opinion, and aligns with the State Agency Reviewing Psychologists' opinions that Hall could work in a setting with "no more than superficial and occasional social interaction."  (*Id*. at 307, 349.)

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err in his evaluation of the Dr. Benson-Blankenship's opinion and, further, that substantial evidence supports the mental limitations set forth in the RFC.

**B.     Additional Evidence**

Hall asserts that she presented new and material evidence to the Appeals Council that provides good cause for remand.  (Doc. No. 13 at 20.)  The evidence at issue is a medical source statement by one of her treating therapists, Dr. Susan Shefner.  (*Id*.)  The Appeals Council acknowledged receipt of the assessment, but rejected it as unrelated to the period at issue.  (Tr. 2.)

The Commissioner argues the Appeals Council appropriately determined Dr. Shafner's statement was not material to the time period at issue, because it was created on October 22, 2018, more than two months after the ALJ's Decision was issued, and did not indicate it applied to the period between the onset of Hall's alleged disability in October 2015 and the ALJ's Decision in August 2018.  (Doc. No. 15 at 20-21.)  Further, the Defendant notes Dr. Shafner cited no medical evidence in support of her opinion, and asserts Hall failed to establish "good cause" for the delay in obtaining this evidence.  (*Id*. at 22.)

The Sixth Circuit has repeatedly held "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec*., 529 F. App'x 706, 717 (6th Cir. 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the

> Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g).

Interpreting this statute, the Sixth Circuit has held "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'"  *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir. 1988)); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (same).  Evidence that "pertains to a time outside the scope of inquiry" is not material. *Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1232, 1233 (6th Cir. 1993) (referring to the four-month period after the date Plaintiff alleged disability until the date she was last insured as the scope of inquiry in that case).  Evidence is not material if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec*., 235F. Supp. 3d 876, 880 (N.D. Ohio 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec*., 540 F. App'x 517 (6th Cir. 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification

for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster,* 279 F.3d at 357.  *See also Willis v. Sec'y of Health & Hum. Servs.,* 727 F.2d 551, 554 (6th Cir. 1984).  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter,* 479 F. App'x at 725. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir. 1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter,* 479 F. App'x at 725; *see also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 479 F. App'x at 725.  *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U.S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The Court finds remand is not appropriate under Sentence Six based on Dr. Shafner's October 2018 medical source statement.  This statement is conclusory and fails to provide any explanation or reference to medical evidence to support her conclusions.[3]  As a threshold matter,

_____

[3]  When prompted by the form to explain the basis for her opinion, Dr. Shafner simply listed Hall's diagnosis of bipolar disorder, unspecified anxiety disorder, and

Hall fails to establish that the residual functional capacity assessment is material.  Dr. Shafner completed a medical source statement regarding Hall's mental capacity as of October 22, 2018.  (Tr. 170-71.)  She did not describe how Hall's mental health impairments had developed over time.  It is clear from the record, however, that they were not static.  For example, at her hearing Hall informed the ALJ that she had recently been diagnosed with PTSD.  (*Id.* at 237-38.)  The ALJ held open the record after the hearing and accepted treatment records relating to this new diagnosis into the record on June 14, 2018.  (*Id.* at 1082-95.)   The mental health records cited by the parties also document changes in Hall's mental health throughout the time at issue.  Hall began mental health treatment at the Charak Center on November 3, 2016.  (*Id.* at 171.)  On March 1, 2018, she was described as "making some progress in therapy." (*Id.* at 981.)  On April 23, 2018, Dr. Shefner assessed Hall as "much improved since beginning treatment." (*Id.* at 1088.) Dr. Shefner's medical source statement, which is expressed though a series of check mark responses to present-tense statements, provides no context for the limitations she describes, as it simply cites a list of diagnosis and as opposed to specific medical records.  (*Id.* at 170-71.)   The Sixth Circuit has made clear that "[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is . . . immaterial." *Wyatt v. Sec'y of H.H.S.*, 974 F.2d 680, 685 (6th Cir. 1992).  The record reflects that Hall's mental health fluctuated during the period at issue.  The Appeals Council reasonably concluded that it described Hall's condition on October 22, 2018, and was therefore not material to the case at hand.

Further, even if it was material, Hall has not established good cause for why this opinion

---

obsessive-compulsive disorder, despite the instruction that, "a simple recitation of the diagnosis will not be sufficient to comply with Social Security's regulations." (Tr. 170-71.)

could not have been provided earlier.  She asserts that a "treating source statement would not be justified until a full assessment of Ms. Hall's functioning could be ascertained," and explains the timing of this medical treatment "was not withing Ms. Hall's control." (Doc. No. 13 at 22.)  Yet she acknowledges that her mental health treatment with Dr. Shafner at the Charack Center began two years earlier, in November 2016.  (Tr. 766.)  This long-standing treatment relationship makes Hall's assertion that Dr. Shafner was unable to proffer an informed opinion of her mental functioning any earlier less than credible.

Accordingly, the Court finds Dr. Shafner's October 2018 statement is not "material" for purposes of social security regulations and, further, that Hall has failed to demonstrate "good cause" for failing to obtain it prior to the ALJ decision.  Therefore, remand under Sentence Six is not warranted.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 1, 2020

35